J-S36002-25

J-S36003-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 812 WDA 2025 |

Appeal from the Order Entered June 6, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000112-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: R.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: F.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 813 WDA 2025 |

Appeal from the Order Entered June 6, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000112-2024

BEFORE:   PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.:          **FILED:  December 23, 2025**

In these consolidated cases, R.H. ("Father") and F.R. ("Mother") (collectively, "Parents") have appealed separately from the June 6, 2025 orders that granted petitions filed by the Allegheny County Office of Children,

---

[*]  Retired Senior Judge assigned to the Superior Court.

Youth and Families ("CYF" or "the Agency") and involuntarily terminated Parents' parental rights to their biological son, R.R., born in March 2023.[1, 2] After careful consideration, we affirm.

We gather the relevant factual and procedural history of this matter from the certified record. Parents' relationship began in 2022, when they met while both going through rehabilitation from substance abuse. *See* N.T., 5/16/25, at 133. The Agency became involved in the above-captioned cases immediately after R.R.'s birth, when it received a referral indicating, *inter alia*, that Parents were homeless and still struggling with addiction.[3] *See id.* at 67-72. Concerns were also raised regarding Parents' respective patterns of criminal behavior. Although the precise circumstances are not evident from the record, Mother had prior convictions for possession of controlled

_____

[1] We have consolidated these cases *sua sponte* as Parents raise similar claims concerning the same factual and procedural events. *See* Pa.R.A.P. 513.

[2] At the conclusion of these proceedings, we discern that the trial court also entered an order that, *inter alia*, changed R.R.'s permanency goal to adoption. *See* N.T., 5/29/25, at 19. To our knowledge, Parents have not appealed from that order.

[3] Prior to R.R.'s birth, Mother had two older children who were the product of prior relationships. Mother's parental rights to one of her older children were involuntarily terminated by an earlier court order in a different case. *See* N.T., 5/16/25, at 69. As a result, in April 2023, the juvenile court entered an aggravated circumstances order based upon this earlier termination. *See* Termination Petition (Mother), 12/27/25, at Exhibit D. This order, however, also directed that efforts to reunify R.R. and Parents should continue. *See id*.

substances, driving under the influence, and endangering the welfare of a child. *See id.* Father was on probation and had an active warrant. *See id.*

On March 3, 2023, the court awarded the Agency emergency protective custody of R.R. On April 12, 2023, the court adjudicated R.R. dependent. He was placed into a pre-adoptive kinship home with Mother's sister, A.P. ("Foster Mother"), and her husband, R.S. ("Foster Father") (collectively, "Foster Parents"). We discern that R.R.'s initial permanency goal was established as reunification.[4] In furtherance thereof, Parents were each individually directed to, *inter alia*, maintain sobriety and obtain appropriate housing. *See id.* at 76, 85. CYF also referred Parents for evaluations with the PA Organization for Women in Early Recovery ("POWER"), which is a "substance-use treatment facility" contracted to provide "assessments and referrals for treatment" for CYF. *Id.* at 12, 16, 20. Parents were also referred for random urine screens through the Allegheny County Health Department. *See id.* at 46.

Between March 2023 and January 2025, the certified record reflects that Parents largely failed to comply with, or make progress concerning, these

_____

[4] We note that the certified records from the above-captioned cases do not include the numerous exhibits that were admitted into evidence at the termination hearing, which included the records of R.R.'s dependency proceedings. We are able, however, to glean sufficient information from the hearing transcripts such that our review has not been impeded. As the parties raising issues for our consideration, we pointedly remind Parents and their counsel that it is, ultimately, their responsibility to ensure that the record on appeal is complete so as to enable our review. *See* Pa.R.A.P. 1921, Note (citing *Commonwealth v. Williams*, 715 A.2d 1101, 1106 (Pa. 1998)).

- 3 -

objectives. As discussed further *infra*, Parents continued to struggle with drug addiction and homelessness. They were each referred to, or sought out, substance abuse treatment from multiple providers, which all proved to be unsuccessful. Parents were also each arrested and incarcerated during this time period. Finally, Parents also failed to obtain suitable housing.

Parents were afforded supervised visitations at Foster Parents' home three days per week. *See id.* at 107-08. The certified record, however, reflects that Mother only took part in "limited" in-person and video visitations with R.R. throughout his dependency. *See id.* at 84. Between March 2023 and June 2024, Father's visits were similarly sporadic. *See id.* at 95-96. Beginning in June 2024, Father began regularly visiting R.R. one day per week at Foster Parents' home. *See id.* at 96-97. Father, however, has consistently declined opportunities for additional visits. *See id.*

On December 27, 2024, CYF filed a joint petition seeking to involuntarily terminate Parents' parental rights.[5] The orphans' court held hearings on May

---

[5] Our Supreme Court has instructed this Court to "engage in limited *sua sponte* review of whether children have been afforded their statutory right to legal counsel when facing the potential termination of their parent's parental rights." *In re Adoption of K.M.G.*, 240 A.3d 1218, 1238 (Pa. 2020). Specifically, we are empowered to review: (1) if the orphans' court appointed counsel to represent a child's "legal interests" as required by 23 Pa.C.S.A. § 2313(a); and (2) where a dual legal interest counsel and guardian *ad litem* is appointed to solely represent both the child's legal and best interests, whether the court "determined that those interests did not conflict." *Id.*

*(Footnote Continued Next Page)*

16 and 29, 2025, at which time R.R. was approximately two years old. Therein, CYF adduced testimony from several individuals, including: (1) POWER program director Rachel Wagner; (2) Beaver County probation officer Liz Prentice; (3) Allegheny County Health Department lab technician Rachel

_____

On February 27, 2025, the orphans' court appointed KidsVoice to serve as R.R.'s legal interest counsel in apparent conformity with Section 2313(a). **See** Order Appointing Legal Counsel, 2/27/25, at 1 (unpaginated) (providing that KidsVoice would represent R.R.'s "legal interests" in these proceedings). Thereafter, however, KidsVoice was identified as R.R.'s guardian *ad litem*. **See** N.T., 5/16/25, at 1. Indeed, KidsVoice previously served as R.R.'s guardian *ad litem* in his dependency proceedings. **See** Petition for Involuntary Termination, 12/27/24, at Exhibit C. At the May 16, 2025 hearing, the orphans' court clarified that it had intended to appoint KidsVoice to dually represent R.R.'s legal and best interests in these proceedings. **See** N.T., 5/16/25, at 6-7. The court asserted that, in appointing KidsVoice, it had contemporaneously concluded that there was no conflict that would preclude this dual appointment. **See id.** There is no record, however, of the trial court's determination taking place prior to the appointment of KidsVoice or the underlying hearings. **Cf. Matter of Adoption of A.C.M.**, 333 A.3d 704, 708 (Pa. Super. 2025) (emphasizing that the orphans' court must determine that there is no conflict in a dual representation situation "'**prior to appointment**'") (emphasis in original) (quoting **K.M.G.**, 240 A.3d at 1236).

We observe no structural error. At the time of these proceedings, R.R. was two years old. Furthermore, the testimony at the hearing indicated that he was pre-verbal and, thus, unable to articulate a preference with respect to the termination of Parents' parental rights. **See** N.T., 5/16/25, at 7, 197. It is well-established that, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests." **In re T.S.**, 192 A.3d 1080, 1092-93 (Pa. 2018). Under these circumstances, the mandate of Section 2313(a) is satisfied where the court "has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings." **Id.** Here, R.R. was represented by counsel who acted as, *inter alia*, his guardian *ad litem* during the termination hearings. Thus, the mandate of Section 2313(a) has been fulfilled. **See id.**

Poole; (4) CYF caseworker Amanda Frank; (5) Beth Bliss, Psy.D., who performed a psychological evaluation of R.R.; and (6) CYF adoption caseworker Cheyenne Tatters. Parents also attended the hearing and were each represented by separate counsel. Mother testified while Father did not.

On June 6, 2025, the orphans' court filed orders that granted CYF's petitions and involuntarily terminated Parents' parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b). On July 2, 2025, Mother timely filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). On July 3, 2025, Father similarly filed a timely notice of appeal and concise statement. On July 11, 2025, the orphans' court filed separate responsive Rule 1925(a)(2)(ii) opinions.

In their respective appellate briefs, Parents have challenged the sufficiency of the evidence with respect to the orphans' court's findings pursuant to Section 2511(a) and (b). *See* Father's Brief at 7, 33-34; Mother's Brief at 6, 18. Our standard and scope of review is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration

- 6 -

of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). It is well-established that this Court need only agree with the court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We will review the orders involuntarily terminating Parents' parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows:[6]

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \*　　\*　　\*　　\*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \*　　\*　　\*　　\*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal;

---

[6]　By analyzing Section 2511(a)(2), we render no conclusions as to the orphans' court's findings under Section 2511(a)(8). **See In re K.R.**, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (observing this Court may proceed to a review of one subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

(2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect  or refusal cannot or will not be remedied."
***In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021).  Grounds for termination pursuant to Section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied."  ***Id.*** (citing ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010)).  In sum, "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties."  ***A.H.***, 247 A.3d at 443.

With respect to Mother, the court found that she suffered from an obvious parental incapacity within the meaning of Section 2511(a)(2), "specifically her repeated and continued pattern of attending treatment, eventually resuming drug use, and ultimately becoming reincarcerated[.]" Orphans' Court Opinion (Mother), 7/11/25, at 6.  The court also concluded that "Mother cannot or will not remedy her incapacity to parent [R.R.]"  ***Id.*** The court emphasized that Mother never "established any meaningful period of recovery" from her substance abuse, criminal behavior, or homelessness. ***Id.*** at 5.  "Rather, the evidence demonstrated a repeated cycle of short-term periods of treatment which were followed by a resumption of drug use, periods of incarceration, and then return to treatment."  ***Id.***

Similarly, the court concluded that Father had failed "to establish and maintain recovery and follow through with treatment[.]"  Orphans' Court

Opinion (Father), 7/11/25, at 6. Thus, the orphans' court found that Father also suffered from a parental incapacity, "specifically his continued use of [narcotics], and repeated and continued pattern of jeopardizing his own recovery, risking his housing, and risking reincarceration due to his continued relationship with Mother[.]" *Id.* at 7-8. Additionally, the court concluded that "Father cannot or will not remedy his incapacity to parent [R.R.]" *Id.* at 8.

Our review of the certified record reveals ample support for the orphans' court's findings. Parents have each been forthcoming regarding their use of narcotics. When the Agency first contacted them in March 2023, Ms. Frank testified that Mother admitted to abusing cocaine, opiates, and alcohol throughout her pregnancy with R.R. *See id.* at 68. Father similarly conceded that he was struggling with a drug addiction that interfered with his ability to care for R.R. *See id.* at 70. Parents remain forthright. As recently as May 2025, Mother told Ms. Tatters that she had suffered a relapse. *See id.* at 188-89. In May 2025, Father admitted to Ms. Tatters and to Dr. Bliss that he had suffered a relapse in his substance abuse. *See id.* at 152, 200-01.

The testimony concerning Parents' drug testing through the Allegheny County Health Department corroborates their struggles. Ms. Poole testified that, between March 2023 and May 2025, Mother attended seven out of forty-five random screens, while Father complied with only three of his fifty-two scheduled screens. *See id.* at 48-49, 52-53. Moreover, Parents tested positive for illicit intoxicants on each of these occasions. *See id.* Specifically,

Parents were each found to have abused, *inter alia*: opiates, cocaine, benzodiazepines, and barbiturates.[7] ***See id.*** at 49-56.

Parents' failure to ameliorate their substance abuse problems is best illustrated, however, from reviewing their respective histories of treatment and incarceration. Ms. Wagner explained that, in March 2023, Parents each completed a POWER assessment that included, *inter alia*, a recommendation concerning the level of substance abuse treatment they required. ***See id.*** at 16, 20. Since their recommendations were not the same, Parents were referred and embarked on separate paths of treatment. We will review and detail those histories separately, beginning with Mother.

Ms. Wagner testified that at the time of her POWER assessment, Mother tested positive for morphine, cocaine, fentanyl, and methadone. ***See id.*** at 17. Ms. Wagner further explained that Mother was recommended for the highest level of possible treatment, *i.e.*, hospital-based inpatient treatment. ***See id.*** at 17-18. Mother was hospitalized for thirty days. ***See id.*** at 18-19. Thereafter, however, Mother failed to participate in three subsequent referrals to POWER for follow-up assessments in November 2023, October 2024, and January 2025, respectively. ***See id.*** at 16, 29-30. Upon her release from the hospital, Mother began a long course of largely self-directed treatment.

---

[7] Mother's screens occurred in March 2023, April 2023, August 2023, September 2024, and January 2025. ***See*** N.T., 5/16/25, at 48-49. Father screened in March 2023, April 2023, and October 2024. ***See id.*** at 52-53.

Ms. Wagner testified that Mother entered inpatient treatment at Sojourner House on April 6, 2023, only to leave the program the next day. *See id.* at 74-75. Ms. Frank averred that Mother was subsequently referred to a separate inpatient program, Family Healing Center, which Mother failed to initiate. *See id.* at 76. Between April 2023 and June 2023, Mother self-reported that she had completed at least three different Pennsylvania detoxification programs. *See id.* at 77. CYF, however, could not confirm the veracity of her claims concerning her treatment. *See id.*

Ms. Frank further explained that, between June 2023 and July 2023, Mother verifiably completed treatment at a facility, Glenbeigh, in Ohio. *See id.* at 78. Thereafter, regrettably, Mother continued to abuse narcotics. *See id.* Between August 2023 and November 2023, Mother unsuccessfully attempted to detox at two additional facilities in Pennsylvania. *See id.* at 79.

Ms. Prentice testified that, in December 2023, Mother was arrested and charged with, *inter alia*, possession of a controlled substance and retail theft in Beaver County. *See id.* at 37-38. Ultimately, Mother was convicted and served a six-month jail sentence. *See id.* at 38. Ms. Frank averred that, in July 2024, Mother was released on probation and transferred to yet another treatment facility, Matrix, where she remained until August 2024, when she transitioned to New Beginnings, which is a "sober living program." *Id.* at 79. In September 2024, however, Mother was "kicked out" of New Beginnings after she tested positive for cocaine and could not produce a "clean screen" to

regain admittance. *Id.* at 79-80. Between September 2024 and October 2024, Ms. Frank's testified Mother was homeless. *See id.* at 82.

Ms. Prentice explained that, in October 2024, Mother was reincarcerated in Beaver County on a probation detainer until January 2025, when she was released and resumed her lifestyle of homelessness and drug abuse. *See id.* at 39-40. Ms. Prentice averred that, in April 2025, Mother was arrested in Allegheny County in connection with ongoing concerns that she was continuing to abuse illicit substances while on probation. *See id.* at 40-41. Upon being taken into custody, Mother admitted to Ms. Tatters that she had relapsed and was still abusing narcotics. *See id.* at 188-89. Ultimately, Mother was transferred to Matrix, again, for treatment on May 7, 2025. *See id.* at 42. Mother remained there at the time of the subject hearings.

Father's treatment history follows a similar narrative thread. Ms. Wagner averred that at his initial POWER assessment in March 2023, Father tested positive for buprenorphine, fentanyl, and morphine. *See id.* at 20. Following this assessment, Father enrolled in a detox program, Gateway, but left the program against medical advice after only two days. *See id.* at 21-22. Thereafter, Father was unsuccessfully referred to POWER another four times in May 2023, November 2023, October 2024, and January 2025, respectively. *See id.* at 20. Contemporaneously, Father also struggled to successfully engage with substance abuse treatment on his own initiative.

Ms. Frank testified that, in May 2023, Father again attempted, unsuccessfully, to complete a course of detox through Gateway. ***See id.*** at 86. Thereafter, he was incarcerated between May 2023 and February 2024 in connection with an undescribed probation violation. ***See id.*** at 86, 93-94. Upon his release in February 2024, Father immediately enrolled in a treatment program at the Hyndman Family Health Center, which was also, ultimately, unsuccessful. ***See id.*** at 86. Finally, Father successfully completed a course of inpatient treatment at a different facility, Greenbriar, between March 2024 and April 2024. ***See id.*** at 86-87. Thereafter, Father began living at a "three-quarter house," Solutions, while continuing to receive outpatient treatment in the form of medication management to curb opioid cravings. ***Id.*** at 87-88.

Ms. Frank reported, however, that as recently as February 2025, Father admitted to CYF that he continued to abuse narcotics in the form of cocaine and marijuana. ***See id.*** at 89. Ms. Wagner further averred that, in March 2025, Father responded to a fifth referral from POWER and participated in a second assessment with the organization, wherein he tested positive for, *inter alia*, cocaine and marijuana. ***See id.*** at 22. Although POWER recommended that Father begin additional outpatient counseling, Ms. Wagner reported that he declined the referral. ***See id.*** In May 2025, Father admitted to Ms. Tatters and Dr. Bliss that he had suffered another relapse. ***See id.*** at 152, 200-01.

Finally, we note that the testimony of Ms. Frank indicated that, as a consequence of Parents' mutual incapacities, R.R. has been in the exclusive

care of Foster Parents for virtually the entirety of his life. ***See id.*** at 75, 102-03, 130-32. Foster Parents have been responsible for R.R.'s everyday needs since he was placed in their care in April 2023. ***See id.*** at 102-03, 130-32.

Reviewing this evidence, it is abundantly clear that Parents suffer from parental incapacities that have caused R.R. to be without essential parental care. Parents have each undertaken protracted and unsuccessful courses of substance abuse treatment for more than two years. Despite these efforts, Mother tested positive for narcotics in January 2025, and Father similarly tested positive in March 2025. ***See id.*** at 22, 52-53. Furthermore, Parents each admitted to relapses in May 2025. ***See id.*** at 152, 188-89, 200-01. Finally, Parents also failed to obtain appropriate housing. ***See id.*** at 39-42, 125 (indicating that Mother remains homeless and Father's current residence in a halfway house is not appropriate for a child of R.R.'s age).

Based upon the foregoing, we observe no abuse of discretion or error of orphans' court's findings with respect to Section 2511(a)(2). There can be no reasonable dispute that Parents suffer from repeated and continued incapacities that have caused R.R. to be without essential parental care, control or subsistence for more than two years. Given Parents' failure to achieve sobriety, obtain housing, or make appreciable progress towards fully remedying their substance abuse in this time period, we find no fault with the orphans' court's conclusion that the causes of Parents' incapacities will not, or

cannot, be remedied. No relief is due with respect to Parents' evidentiary challenges under Section 2511(a)(2).

Since adequate grounds for termination exist pursuant to at least one subsection of Section 2511(a), we now turn to review the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). We remain mindful that the determination of a child's "particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." *Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023). Accordingly, this inquiry is neither formulaic, nor mechanical. *See id.*

Our review must include consideration of the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has explained, however, that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause extreme emotional consequences or significant, irreparable harm. *Id.* at 1109-10. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (cleaned up). Pennsylvania courts should also consider "whether the children are in a pre-adoptive home and whether they have a bond with their

foster parents." **K.T.**, 296 A.3d at 1106. A child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." **Id.**

Pursuant to Section 2511(b), the orphans' court concluded that R.R.'s needs and welfare would be best served by terminating Parents' parental rights and preserving his relationship with Foster Parents. **See** Orphans' Court Opinion (Mother), 7/11/25, at 5-6; Orphans' Court Opinion (Father), 7/11/25, at 6-7. Specifically, the court found R.R. was "stable and secure in his pre-adoptive foster home and has a strong bond with [Foster Parents] who have been responsible for meeting his day-to-day needs for his entire life." **Id.** Overall, the orphans' court opined that R.R. was "thriving" in Foster Parents' care, who were acting as R.R.'s "psychological parents" in all material respects. Orphans' Court Opinion (Father), 7/11/25, at 7.

Upon review, we find more-than-sufficient support for the orphans' court's findings under Section 2511(b) in the certified record. With respect to the mandated bonding analysis, we begin by noting there is no evidence that R.R. shares any manner of positive parental bond with Mother. After conducting an interactional evaluation of Mother and R.R. in May 2025, Dr. Bliss opined that R.R. did not want to spend time, or interact, with Mother. **See** N.T., 5/16/25, at 162-65. Indeed, Dr. Bliss reported that R.R. was very upset when he was forced to be in a room with Mother separate from Foster Parents and actively attempted to escape. **See id.** Ms. Frank similarly testified that Mother has only had "limited" interactions with R.R. since his

removal and that R.R. is "fearful" in Mother's presence. *Id.* at 85. It is well-established that, "in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *In re Adoption of A.H.*, 247 A.3d 439, 445 (Pa. Super. 2021) (citing *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008)). Thus, we readily infer that Mother and R.R. did not have a necessary and beneficial bond that should be preserved.

The certified record reflects, however, that Father and R.R. have bonded, largely as a result of Father's resumption of consistent visits once per week beginning in June 2024. *See* N.T., 5/16/25, at 96-97. Based upon her observations during the course of her evaluation, Dr. Bliss concluded R.R. and Father "appear to have a strong positive attachment and bond." *Id.* at 155. Dr. Bliss opined that the bond between Father and R.R. was "beneficial," and she cautioned against severing it. *Id.* at 165. Specifically, she recommended that only Mother's parental rights should be terminated and that Father's parental rights should be preserved through the entry of an award of subsidized permanent legal custody ("SPLC") to Foster Parents.[8] *See id.*

Although Father and R.R. undoubtedly shared some manner of bond, we observe no abuse of discretion in the orphans' court's conclusion that R.R.'s

---

[8] Under Pennsylvania law, SPLC refers to "an arrangement whereby a juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis to a custodian. Parental rights are not terminated." *In re S.H.*, 71 A.3d 973, 977-78 (Pa. Super. 2013) (cleaned up).

- 18 -

bond with Foster Parents was stronger and entitled to parental primacy. Specifically, while Dr. Bliss recommended against terminating Father's parental rights, she simultaneously conceded that Foster Parents were R.R.'s only true "psychological parents" at the time of the termination hearing. *Id.* at 174. Indeed, Dr. Bliss further admitted that Father remained incapable of providing safety and stability to R.R. *See id.* at 156 ("I certainly do not believe that he's in a position to parent or care for [R.R.]").

The certified record reflects that, in sharp contrast to Parents, Foster Parents have been faithfully and consistently providing everyday care to R.R. for the virtual entirety of his young life. *See id.* at 102. Ms. Frank, Ms. Tatters, and Dr. Bliss all testified that R.R. and Foster Parents are closely and affectionately bonded. *See id.* at 103, 164, 195-96.

We also emphasize that Dr. Bliss's viewpoint concerning the preservation of Father's parental rights was not shared by the other testifying witnesses. While acknowledging that R.R. and Father shared a "good bond," Ms. Frank opined that R.R. would not suffer any severe detrimental effects if Father's parental rights were terminated. *Id.* at 127-28. Specifically, she noted that R.R. does not suffer "fallout" or "emotional dislocation" when Father missed a scheduled visit. *See id.* at 128. Indeed, Ms. Frank testified that R.R. was simply unable to "understand" Father's absence and, thus, would not unduly suffer if his parental rights were terminated. *Id.* Ms. Frank opined it was more important for R.R. to have the stability offered by Foster Parents,

rather than denying R.R. permanency to leave open the possibility Father would resume parental duties at some unknown future time. *See id.* at 132.

Ms. Tatters' testimony dovetailed closely with Ms. Frank's position. Specifically, she attested that R.R. did not display any negative reactions when Father's weekly visits were cancelled for several weeks in a row. *See id.* at 196-97. Ms. Tatters further averred that, although she was aware of Dr. Bliss's recommendation, she continued to believe that termination of Father's parental rights was in R.R.'s best interests. *See id.* at 200.

Instantly, the orphans' court chose to credit the viewpoint espoused by Ms. Frank and Ms. Tatters, *i.e.*, that the termination of Parents' parental rights offered R.R. the best opportunity for stability and permanency. *See* Orphans' Court Opinion (Mother), 7/11/25, at 5-6; Orphans' Court Opinion (Father), 7/11/25, at 6-7. Since the certified record supports the orphans' court's credibility and factual conclusions under Section 2511(b), we will not disturb them. *See M.E.*, 283 A.3d at 829-830. As this Court has observed, it is "within the discretion of the [trial] court to prioritize the safety and security" of children "over their bonds with their parents, and this Court will not interfere with the court's assessment when its factual findings are supported by the record." *Id.* at 839 (cleaned up). No relief is due with respect to Parent's evidentiary challenges pursuant to Section 2511(b).

J-S36002-25

J-S36003-25

Based upon the foregoing, we find no abuse of discretion or error of law in the orphans' court's involuntary termination of Parents' parental rights. Accordingly, we will affirm the underlying orders.

Orders affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/23/2025